**Affirmed and Opinion filed October 23, 2018.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-17-00227-CR

---

**DUSTIN DEUTSCH, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 183rd District Court**
**Harris County, Texas**
**Trial Court Cause No. 1449535**

---

## O P I N I O N

Appellant Dustin Deutsch, a former investigator with the Harris County District Attorney's Office, appeals from his conviction for theft by a public servant in an amount over $200,000. *See* Tex. Penal Code § 31.03(a), (e)(6)(A), (f)(1). A jury found appellant guilty and assessed his punishment at five years' imprisonment and a $5,000 fine. Appellant's three issues on appeal complain about the sufficiency of the evidence to (1) corroborate accomplice witness testimony, (2) prove the amount of the theft, and

(3) establish that the owner of the allegedly stolen property was the person identified in the indictment. We affirm.

## *Background*

Appellant was accused of stealing rare comic books valued at over $200,000 that were evidence in a criminal investigation while he was an investigator for the Harris County District Attorney's Office. The comic books, along with other memorabilia, allegedly had been purchased by Anthony Chiofalo with funds he stole from Tadano America, where he was employed as general counsel. The comic books were contained in several storage units over which appellant had control while investigating the case against Chiofalo. The key witness against appellant was another district attorney's office investigator, Lonnie Blevins, who confessed to participating in the theft and identified appellant as his partner in crime.

Gene Brown, Vice President of Legal Affairs and Controller for Tadano, testified that an internal investigation determined that his predecessor, Chiofalo, had authorized the payment of large legal fees to fictitious outside law firms that Chiofalo deposited to a bank account he controlled. According to Brown, the fraudulent payments amounted to $8,986,272.25. Chiofalo spent the money on a house, as well as rare comic books and sports memorabilia. Tadano filed civil litigation and a criminal complaint against Chiofalo.

As part of the criminal investigation, the district attorney's office executed several search warrants, including at storage units leased by Chiofalo. The district attorney's office put locks on the storage units until it completed its inventory of the contents. After completion of the inventory, Tadano eventually sold the contents, recouping just over $4 million. Brown testified that he had a greater right to possession of the comic books in the storage units than any district attorney's office employee.

2

Terrance O'Neill and Josh Nathanson both testified that they purchased rare comic books from Blevins at conventions in 2012. O'Neill stated that he purchased comic books from Blevins for $38,000 in San Antonio that year and was subsequently part of a three-person group that purchased comic books from Blevins in Chicago for $70,000. O'Neill explained that payment for the comics was a combination of cash and checks made out to Blevins. Nathanson, who also took part in the Chicago sale, explained that he paid particular attention to one of the comic books Blevins sold, *All Star Comics #3*, because it was the most valuable. Nathanson became suspicious because the *All Star Comics #3* appeared to be the same one that had recently been sold at auction. When sold at auction, the comic was graded by a comic books grading company and was encapsulated or contained in a protective plastic case. When purchased by Nathanson and the other buyers, *All Star Comics #3* was sold ungraded and unencapsulated. Based on his suspicions, Nathanson contacted Heritage Auctions, which had handled the recent auction.

Brian Vaclavik, who was at the time a private investigator working for Tadano,[1] testified that he conducted an internal investigation and concluded that Chiofalo had engaged in a "false invoice scheme." Vaclavik contacted the district attorney's office and provided documents from his investigation. Later, during a conversation at the district attorney's office that included appellant and assistant district attorney Wendy Baker, Vaclavik told the others that if the comic books were broken out of their cases, "they would be like bearer bonds. You couldn't trace them."

Vaclavik subsequently learned of the sale of comic books in Chicago by Blevins and learned that Blevins worked for the district attorney's office and had a long association with appellant, who was the lead investigator on the Chiofalo case. Blevins

---

[1] At the time of trial, Vaclavik was the chief fraud examiner at the Harris County District Attorney's Office.

and appellant had been partners, had worked in the fire marshal's office together, and had worked together in the Major Offenders Division of the district attorney's office.

Wendy Baker was an assistant district attorney when she was assigned to work on the Chiofalo case.[2] She testified that appellant was the lead investigator on the case and was in possession of the keys to the locks on the storage units. Appellant was responsible for performing an inventory of the storage units' contents, and he chose to inventory the comic books last, allegedly because they took up less space in the units. Baker complained that the comic books initially should have been photographed as part of the inventory process, as all of the other items had been, but appellant failed to do this. Baker confirmed Vaclavik's testimony that he had told her and appellant that the comic books would be essentially untraceable if they were unencapsulated.

Baker further testified that Blevins ordinarily would have had no reason to be part of the Chiofalo investigation, but he was a longtime friend and partner of appellant. She stated that appellant and Blevins worked particularly late on June 12, 2012 while inventorying the storage units. This was supported by time sheets admitted as exhibits.

Blevins testified that he and appellant stole comic books from the storage unit on June 12 and 14, 2012. Blevins explained that they carried the comic books out of the units and placed them in Blevins's county vehicle, after which Blevins drove the comic books home and hid them in a plastic storage bin. Blevins said that although appellant and he had discussed where to sell the comic books, Blevins went alone to the conventions and transacted the sales. Because appellant determined that the plastic cases on some of the comic books could be traced, Blevins removed the cases and gave them to appellant for disposal. Blevins stated that he communicated with appellant via cell phone while at each of the conventions to discuss the sales terms, and cell phone

---

[2] At the time of trial, she was in private practice.

4

records admitted into evidence confirmed communications on the relevant dates. Blevins received cash and checks in exchange for the comic books; he deposited the checks in his own bank account and gave the cash ($30,000) to appellant. Blevins later gave appellant a cashier's check for $8,000 and an additional amount in cash as his share of the proceeds from the sale of the comic books. A copy of the cashier's check made out to appellant and documentation of Blevins's withdrawals from his checking account were admitted into evidence.

The FBI subsequently contacted and then arrested Blevins for the theft of the comic books. Blevins, having pled guilty in federal court, entered an agreement with the State whereby he would not face state charges if he cooperated in the investigation and testified.

Blevins detailed his long history with appellant. They attended the police academy together, worked together as fire marshals, started a business together, and were hired by the district attorney's office as a "package deal." Blevins testified that appellant informed him of the Chiofalo investigation and arranged for Blevins to participate in the inventory. Blevins said that, on June 11, appellant said to him, "We can take some of these things," but no concrete plan developed from the conversation. On June 12, however, the power went out and many of their co-workers left rather than work in the dark. Appellant reported "that the computers were down, that the sensors weren't working and this would be a good opportunity . . . to steal some items."

Jeffrey Greenwell was the manager of the storage facility. He and appellant each placed a set of locks on the units so that it would take two keys to open any particular unit. Greenwell said that when the inventory was being conducted on the units, he would either open his set of locks himself or hand the keys to appellant. Greenwell further testified that, during the power outage at the storage facility on June 12, 2012, appellant came by his office. Greenwood told appellant that the gates would not open

and close due to the power outage. Though it was not discussed, the security monitors in Greenwell's office were blank, as the cameras could not record during the power outage.

Barry Sandoval, director of operations for Comics and Comic Art at Heritage Auctions, testified that Chiofalo bought numerous comic books through Heritage. He explained that Chiofalo bought some in auctions and others through "private treaty transactions" in which Heritage acted as a broker between the seller and Chiofalo. Sandoval discussed an exhibit list of the comic books allegedly stolen by appellant and Blevins and identified the items listed as comic books Chiafalo purchased through Heritage. He further testified to the amounts Chiofalo paid for those comic books. According to Sandoval, Chiofalo paid a total of $372,351.47 for the comic books. For the comic books Chiofalo bought in multiples, Sandoval used the lowest price paid to calculate the value of the allegedly stolen comic books. Specifically regarding *All Star Comics #3*, the most expensive of the allegedly stolen comic books, Sandoval said that Chiofalo paid $200,000 in a private treaty transaction on March 22, 2012. *All Star Comics #3* had previously sold to another buyer for $49,293. Sandoval further stated that Chiofalo appeared to be a willing buyer of the comic books he bought at the prices paid, and Sandoval was not under the impression that Chiofalo was forced or threatened in any way to make the purchases.

Sandoval agreed that, assuming the comic books were in the same condition at the time of the alleged theft as they were when Chiofalo bought them, their value would be the same. Sandoval acknowledged, however, that without having looked at the comic books at the time of the alleged theft, he could not say that they were necessarily in the same condition as when Chiofalo bought them. Sandoval further explained that, when Heritage auctioned items, it charged a "buyer's premium" of 19.5 percent. He testified that this did not change the market value of the auctioned items because the

buyer was willing to pay the price that included the auction markup. He said there is no buyer's premium in private sales, but sellers pay the fee for that service.

As stated, the jury convicted appellant and assessed his punishment at five years' imprisonment and a $5,000 fine. On appeal, appellant challenges the sufficiency of the evidence to (1) corroborate Blevins's accomplice witness testimony, (2) prove the amount of the theft, and (3) establish that Brown was the owner of the comic books.

### *Corroboration of Accomplice Witness Testimony*

In his first issue, appellant contends that the evidence was insufficient to corroborate Blevins's accomplice witness testimony. A conviction obtained based on accomplice testimony must be supported by sufficient corroborating evidence tending to connect the defendant to the offense committed. Tex. Code Crim. Proc. art. 38.14; *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007). When reviewing the sufficiency of the evidence to corroborate accomplice testimony, we eliminate the accomplice testimony and then examine the remaining portions of the record to see if there is any evidence that tends to connect the defendant with the commission of the offense. *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008).

The corroborating evidence need not, standing alone, rise to the level of proof beyond a reasonable doubt. *Id.* Instead, the evidence simply must link the defendant to the commission of the offense and show that rational jurors could conclude that the evidence sufficiently "tended to connect" the defendant to the offense. *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009). Accordingly, corroborative evidence need not be legally sufficient in itself to establish a defendant's guilt. *Casanova v. State*, 383 S.W.3d 530, 538 (Tex. Crim. App. 2012). In determining the question of corroboration, courts view the evidence in the light most favorable to the verdict. *Lacaze v. State*, 346 S.W.3d 113, 117 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd). Evidence tending to connect the accused to the commission of the offense

may be circumstantial and need not be direct. *See Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011). While opportunity evidence is insufficient on its own to corroborate accomplice-witness testimony, it may be considered in connection with other evidence that tends to connect the accused to the crime. *Id*.

In his arguments, appellant emphasizes the lack of direct evidence that he committed a crime apart from Blevins's testimony. O'Neill and Nathanson, who bought the stolen comic books, said that they only dealt with Blevins. There were no photographs, other eyewitnesses, fingerprints, or documentary evidence directly connecting appellant to the theft. Appellant also points out there was no evidence he did anything with the proceeds of the sale, e.g., no unusual purchases or investments in the aftermath of the crime. Appellant further notes how strong the case was against Blevins and that Blevins was the only person involved in selling the comic books. Appellant additionally emphasizes that Blevins was motivated to falsely name him in the theft because certain potential charges against Blevins were to be waived if he testified.

As mentioned above, however, direct evidence is not necessary to corroborate accomplice testimony. *See Smith*, 332 S.W.3d at 442. Moreover, in the present case, even eliminating Blevins' testimony from consideration, there was considerable evidence tending to connect appellant to the theft of the comic books. *See* Tex. Code Crim. Proc. art. 38.14; *Druery*, 225 S.W.3d at 498.

As set forth in detail above, several witnesses confirmed that appellant was the lead investigator in the case against Chiofalo, was responsible for the inventory of the items Chiofalo kept at the storage facility—including the comic books—and alone possessed the keys required to open the individual storage units. It was appellant who decided to inventory the comic books last and who failed to ensure that photographs were taken of the comic books as part of the inventory process.

Substantial evidence also established a close link between appellant and Blevins, including their professional and personal relationships and that appellant is the one who made it so Blevins could work on the inventory.[3] Timesheets demonstrated that appellant and Blevins worked until 10 P.M. on the first day of the alleged theft, June 12, 2012. Greenwell, the storage facility manager, indicated that appellant was in his office where the security monitors were during the power outage on June 12, and could have seen the storage facility's security cameras were no longer recording. Witnesses additionally testified appellant was present during a conversation in which rare comics were likened to untraceable bearer bonds once they were removed from their plastic containers, and the comics in question were removed from their protective containers before sale. Phone records showed frequent communication between appellant and Blevins during periods when Blevins was attempting to sell the comic books at conventions.

A cashier's check for $8,000, made out to appellant and drawn from Blevins's savings account after Blevins sold some of the comic books, also was admitted into evidence. Taken together, this evidence strongly connects appellant to the theft of the comic books. Because Blevins's accomplice testimony was supported by sufficient corroborating evidence tending to connect the defendant to the offense charged, we overrule appellant's first issue. *See* Tex. Code Crim. Proc. art. 38.14; *Druery*, 225 S.W.3d at 498.

### *Value of Stolen Property*

In his second issue, appellant challenges the sufficiency of the evidence to

---

[3] While evidence establishing a connection between appellant and the accomplice witness may be considered in the analysis, it is not sufficient by itself to corroborate the witness's testimony. *See Smith v. State*, 436 S.W.3d 353, 370 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd); *Gaston v. State*, 324 S.W.3d 905, 909 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd); *Nolley v. State*, 5 S.W.3d 850, 854–55 (Tex. App.—Houston [14th Dist.] 1999, no pet.).

establish that he stole goods over $200,000 in value. In assessing the sufficiency of the evidence to support a conviction, we must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational trier of fact could have found the challenged element or elements of the crime beyond a reasonable doubt. *See Whatley v. State*, 445 S.W.3d 159, 166 (Tex. Crim. App. 2014); *see also Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). In reviewing historical facts that support conflicting inferences, we presume that the jury resolved any conflicts in the State's favor and defer to that resolution. *Whatley*, 445 S.W.3d at 166. We do not sit as a thirteenth juror and may not substitute our judgment for that of the factfinder by reevaluating the weight and credibility of the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). As judge of the credibility of the witnesses, a jury may choose to believe all, some, or none of the testimony presented. *Cain v. State*, 958 S.W.2d 404, 407 n.5 (Tex. Crim. App. 1997).

"Value" under the theft statute is "fair market value" at the time and place of the offense, if the property has an ascertainable fair market value. *See* Tex. Penal Code § 31.08; *Smiles v. State*, 298 S.W.3d 716, 719 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Although the statute does not provide a definition of "fair market value," the phrase has been judicially defined as the amount of money that the property would sell for in cash, given a reasonable time for selling it. *Keeton v. State*, 803 S.W.2d 304, 305 (Tex. Crim. App. 1991); *Uyamadu v. State*, 359 S.W.3d 753, 759 (Tex. App.—Houston [14th Dist. 2011, pet. ref'd). Stated alternatively, fair market value is the price the property would bring if offered for sale by one who desires to sell, but is not obligated to sell, and bought by one who desires to buy, but is under no necessity of buying. *Uyamadu*, 359 S.W.3d at 759; *Valdez v. State*, 116 S.W.3d 94, 98 n.1 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd). The relevant market for determining value is not that of the thief, but of the party from whom the item was stolen. *Id*. at 99. There is no

one particular method of proving fair market value, and methods of proof have included an owner's valuation as well as a non-owner's expert opinion. *Keeton*, 803 S.W.2d at 305; *Sanchez v. State*, 521 S.W.3d 817, 820 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd).

The State's primary method of proving value in this case was the testimony of Barry Sandoval, the Director of Operations for Comics and Comic Art at Heritage Auctions, a company that sells vintage comic books online and in traditional auctions.[4] As set forth above, Sandoval testified that he assisted in assembling a list of the prices Chiofalo paid for the comic books that were allegedly, subsequently stolen by appellant and Blevins. Chiofalo bought all of the comic books in question either in Heritage auctions or through private sales brokered by Heritage. Sandoval stated that Chiofalo paid a total of $372,351.47 for the comic books, with the caveat that for issues where Chiofalo bought more than one, the lowest price paid was used to calculate the total. Sandoval further opined that if the comics were still in the same condition when the theft occurred as when Chiofalo bought them a few months before, their value then would have been in excess of $372,000.

On cross-examination, Sandoval acknowledged that the value could have changed with the conditions of storage and the removal of the comic books' protective cases. However, evidence indicated that the storage units where Chiofalo kept the comic books were climate controlled, and it was Blevins who removed the cases *after the theft* at appellant's suggestion. Sandoval further admitted that for some of the comic books, the price Chiofalo paid included a "buyer's premium" that went to Heritage as the auction house. But Sandoval explained that this amount should be considered part

---

[4] Appellant does not contest Sandoval's expert qualifications on appeal and conceded them in the trial court. *See generally Sanchez*, 521 S.W.3d at 821 (explaining that objections to a witness's qualifications to opine on fair market value must be first raised in the trial court (citing *Moff v. State*, 131 S.W.3d 485, 490 (Tex. Crim. App. 2004))).

of the fair market value because the buyer was willing to pay it in order to obtain the items. Regardless, Sandoval further noted that (1) the premium was only 19.5%, (2) even if this was applied to the total, the value would still be "around $297,000,"[5] and (3) Chiofalo did not pay the premium on the most expensive single comic, *All Star Comics #3*, which alone sold for $200,000. Sandoval further acknowledged that *All Star Comics #3* had previously sold for $49,293; but stated that Chiofalo appeared to be a "willing buyer" in making the transactions.

Beyond the one lower price once paid for *All Star Comics #3*, appellant did not offer any contradicting evidence on value. In his brief, appellant questions using prices paid by Chiofalo—whom appellant calls an "outlier" who exhibited "grandiosity, episodic impulsivity and poor judgment"—to ascertain the fair market value of the comic books. Appellant, however, does not cite any authority or evidence supporting this critique of Sandoval's method for calculating fair market value. As we mentioned above, the law does not favor one particular method of proving fair market value. *See Keeton*, 803 S.W.2d at 305; *Sanchez*, 521 S.W.3d at 820. Moreover, Sandoval's testimony appears to reflect our previous statements regarding fair market value expressed as the price a willing buyer is willing to pay and a willing seller is willing to accept. *See Uyamadu*, 359 S.W.3d at 759; *Valdez*, 116 S.W.3d at 98 n.1. As Sandoval said, Chiofalo appeared to be a willing buyer of the comic books.

Appellant further emphasizes that Sandoval could not be certain of the condition of the comic books at the time of the theft, but there was evidence that the comic books were stored in protective cases in a climate-controlled storage facility at the time of the theft. Given that Chiofalo purchased the comic books just a few months before appellant allegedly stole them, the jury could reasonably have concluded that the comic

---

[5] The actual number after subtracting 19.5 percent is $299,742.93.

books were in substantially the same condition at the time of theft.[6] Sandoval need not have examined the particular comic books to have opined on their value. *See, e.g., Sanchez*, 521 S.W.3d at 822 (rejecting sufficiency challenge to evidence of value of stolen vehicle based on officer's research even though officer had not examined the particular vehicle).

Appellant next asserts that the fact that the same copy of *All Star Comics #3* Chiofalo bought for $200,000 had previously sold for $49,293 undercuts Sandoval's value testimony. To the extent that the $49,293 purchase price could also be evidence of the value of that particular comic book, we note that the jury may well have taken it into account. The jury indeed could have reasonably concluded that the $200,000 price was inflated for that comic book and the $49,293 price was a more likely indicator of fair market value. *See Cain*, 958 S.W.2d at 407 n.5 (explaining that as factfinder, a jury is free to believe all, some, or none of a witness's testimony). Even so, since Sandoval testified to an overall value of the stolen comic books in excess of $372,000, the jury still could have concluded, as it did, that the value of the stolen property was over $200,000.[7] Appellant did not ask Sandoval about any lower prices paid for any other comic books.

Appellant additionally suggests that it was improper for Sandoval to consider any private treaty transactions because, appellant asserts, they occurred "outside the market." Appellant, however, does not cite any authority or evidence to support this position. Sandoval, the comic book value expert at trial, calculated value including sums paid in private treaty transactions as he believed them to be representative of fair market value. He further indicated that Chiofalo appeared to be a willing buyer in those

---

[6] For example, *All Star Comics #3* was purchased on March 22, 2012 and stolen on June 12 or 14, 2012.

[7] $372,000 – ($200,000 – $49,293) = $221,293.

transactions.[8]

Viewing all of the evidence in the light most favorable to the verdict, the evidence and reasonable inferences therefrom were sufficient for a rational fact finder to conclude that appellant stole comic books with a fair market value exceeding $200,000. *See Whatley*, 445 S.W.3d at 166.[9] Accordingly, we overrule appellant's second issue.

### *Ownership of Stolen Property*

In his third issue, appellant contends that the State failed to establish that the person alleged in the indictment to be the owner, Gene Brown, was the actual owner of the comic books at the time of theft. Appellant asserts that Brown never claimed that he or his employer Tadano owned the comic books; appellant maintains instead that "[a]ll evidence revealed that Anthony Chiofalo owned the comic books." Appellant further notes that Brown only said that he had a greater right to possession of the property than anyone in the district attorney's office, not that he had a greater right to possession than did Chiofalo. Appellant, however, misunderstands what the State was required to prove.

Although the Penal Code does not require proof of the name of the owner as an element of a theft offense, the Code of Criminal Procedure requires that the name of

---

[8] Appellant also asserts in his brief that Sandoval appeared uncertain that purchase price alone could establish fair market value and "conceded" that his definition of value was different than the correct definition under the Penal Code. The cited portions of Sandoval's testimony, however, do not support these interpretations.

[9] In a post-submission brief, appellant argues that this court should take judicial notice of particular editions of a commercially published, comic book pricing guide in assessing the sufficiency of the evidence adduced at trial regarding value. Appellant did not introduce or attempt to introduce these editions into evidence at trial and did not raise this issue in his original briefing. We need not consider arguments raised for the first time in a reply brief and decline to do so now. *See* Tex. R. App. P. 38.3; *Taylor v. State*, 553 S.W.3d 94, 100 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *Morales v. State*, 371 S.W.3d 576, 589 n.15 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd).

the owner be alleged in the charging instrument. Tex. Code Crim. Proc. art. 21.08; *Byrd v. State*, 336 S.W.3d 242, 251 (Tex. Crim. App. 2011). "[T]he legislature has given 'owner' an expansive meaning: ***anyone having*** a possessory interest in the property through title, possession, whether lawful or not, or ***a greater right to possession of the property than the defendant, is an owner*** of the property." *Garza v. State*, 344 S.W.3d 409, 413 (Tex. Crim. App. 2011) (emphasis added) (citing Tex. Penal Code § 1.07(a)(35)(A)); *see also Sowders v. State*, 693 S.W.2d 448, 451 (Tex. Crim. App. 1985) (explaining that all the State had to prove was that the alleged owner had a greater right to possession than the defendant); *Campos v. State*, 317 S.W.3d 768, 776 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) ("An owner need not be an exclusive owner or in actual possession of the property."). When a corporation is asserted to be the owner of property in this context, it is permissible to name an employee of the corporation as the owner. *See Garza*, 344 S.W.3d at 413.

Brown testified at trial that as a Tadano employee, he had a greater right to possession of the comic books than any employee of the district attorney's office, which would include appellant. Additional evidence supported this assertion in that it indicated Chiofalo had used money stolen from Tadano to purchase the comic books and Tadano filed a civil action and a criminal complaint against Chiofalo regarding the theft. Additionally, Baker, the assistant district attorney assigned to the Chiofalo case, testified that the "primary goal" of the inventory conducted by appellant, Blevins, and others "was to return all of the property to the Complainant, Tadano." Vaclavik, the private investigator, echoed Baker's statements in his testimony. Moreover, when the district attorney's office completed its inventory, the items purchased by Chiofalo were indeed returned to Tadano. *See Sowders*, 693 S.W.2d at 451 (noting as evidence of ownership that the stolen money was ultimately turned over to the alleged owner).

The jury reasonably could have concluded from this evidence that Tadano

15

employee Brown had a greater right to possession of the comic books than did appellant, who only had a connection to the property by virtue of his employment with the district attorney's office and the assignment to inventory the contents of the storage units. *See Garza*, 344 S.W.3d at 413; *Sowders*, 693 S.W.2d at 451; *Campos*, 317 S.W.3d at 776. Appellant, in fact, does not assert that he had a greater right to possession of the comic books than did Tadano or Brown. Because the evidence was sufficient to support the conclusion that Brown had a greater right to possession of the property than appellant, we overrule appellant's third issue.

We affirm the trial court's judgment.


/s/     Martha Hill Jamison
        Justice


Panel consists of Justices Boyce, Jamison, and Brown.
Publish — TEX. R. APP. P. 47.2(b).