

# NUMBER 13-24-00438-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

RUBEN GONZALEZ,                                              Appellant,

v.

THE STATE OF TEXAS,                                          Appellee.

## ON APPEAL FROM THE 197TH DISTRICT COURT
## OF CAMERON COUNTY, TEXAS

# MEMORANDUM OPINION

**Before Justices Peña, West, and Fonseca**
**Memorandum Opinion by Justice Peña**

A jury found appellant Ruben Gonzalez guilty on one count of criminally negligent homicide, a state-jail felony, and one count of intentionally or knowingly causing serious injury to a child, a first-degree felony. *See* TEX. PENAL CODE §§ 19.05, 22.04(a)(1), (e). Gonzalez was sentenced to concurrent prison terms of two and thirty years, respectively, for the offenses. By two issues, which we reorder, Gonzalez contends (1) the evidence

was legally and factually insufficient to support his conviction as a party to the offenses charged, and (2) the trial court violated his rights under the Sixth Amendment's Confrontation Clause by admitting statements from non-testifying co-defendants. We affirm.

## I.　BACKGROUND

### A.　Indictment and Verdict

In January 2022, a grand jury indicted Gonzalez on one count of murder and four counts of injury to a child. As to count one (murder), the indictment alleged that on or about January 23, 2021, Gonzalez caused the death of J.H.[1] by providing inadequate medical care to him and restricting his food and water intake. Additionally, it alleged the death occurred during the commission of a felony—continuous family violence. *See id.* § 19.02(b)(2). Count two (injury to a child) alleged that on or about the same day, Gonzalez caused serious bodily injury to the child, over whom Gonzalez had assumed care, custody, or control. *See id.* § 22.04(b)(2).

After a five-day trial, a jury found Gonzalez guilty of criminally negligent homicide, a lesser-included offense, as to count one and guilty as charged in count two. This appeal followed.

### B.　Trial Evidence

J.H. was born in 2007 and resided in a home with his younger brother D.H., maternal grandmother (Grandmother), mother (Mother), and Grandmother's boyfriend, Gonzalez. Yvonne Mendez Reyna testified she was J.H.'s special education teacher for

---

[1] To protect the identities of the victim and other minors in this case, we refer to them by their initials. *See* TEX. CONST. art. I, § 30(a)(1) (providing that a crime victim has "the right to be treated . . . with respect for the victim's dignity and privacy throughout the criminal justice process"); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

a year and a half before his death. When asked how J.H. appeared before the pandemic, Reyna stated that J.H. "liked to eat" and "seemed normal. [She] didn't see anything wrong with him." However, Reyna noticed that "[h]e seemed slimmer" from that point until his death. The trial court admitted into evidence a video recording of Reyna's January 20, 2021 Zoom class with J.H. Reyna testified J.H.'s "voice didn't sound the same" and that she had never heard him sound like that before; "she knew something was off" because she could not understand him. Reyna testified J.H.'s appearance was "not normal" because "he's thinner, he has a scrape[] or something on the side of his face. He's disoriented, he's not speaking, slurred speech." The recording shows Reyna spend over twenty minutes waving and calling to get J.H.'s attention, but he did not respond and stares blankly. In the background, an adult male voice is heard stating, "Now he's pretending he doesn't know anything." On cross-examination, Reyna testified she texted Mother about concerns after the January 20 class ended, and Mother responded she would be taking J.H. to the doctor. According to Reyna, Grandmother "usually made the decisions and [was the one] that [Reyna] usually spoke to," though Mother was the documented guardian on school records. Reyna testified that she had never met Gonzalez and never saw him at any school functions.

Robuel Estrada testified he is a City of Raymondville emergency dispatcher, and he received a call concerning J.H. on the morning of January 21, 2021. A recording of said 911 call was admitted into evidence and played in open court. In the recording, Mother stated J.H. has COVID-19 and is having breathing issues. Estrada testified, based on his observations of Mother's behavior, that "it didn't seem like it was urgent."

Lorissa Garcia testified she was the EMT who responded to J.H.'s emergency call.

3

The trial court admitted into evidence a Willacy County EMS patient care record for J.H., including photographs of the home. Garcia explained that EMS arrived on the scene at 2:56 a.m. following a report of a thirteen-year-old male experiencing breathing problems, and J.H. was found lying flat on his back and breathing very shallow. Garcia further testified she did not believe he was thirteen because he was so small and wearing diapers that "looked like a Size 5 or Size 6 in toddler diapers." Garcia further observed that J.H.'s "ribs and his collarbones were all protruding out" and that he appeared "very malnourished." In reviewing photos of the home, Garcia confirmed Gonzalez and Grandmother's bedroom had a doorway which led to J.H.'s bedroom. Garcia testified she did not see any kind of affection toward J.H. from Mother, Grandmother, or Gonzalez.

When asked who is responsible for taking care of a child, Narciso Hernandez, a special investigator with the Texas Department of Family and Protective Services (the Department), explained it is "any adult in a residence with a child." Hernandez explained that anyone who performs "caregiving tasks"—for example, "taking them to school, feeding them, making sure they have a roof over their head, proper hygiene, [and] clothing"—would be responsible for taking care of the child. Hernandez clarified that depending on the family composition, the "primary disciplinarian" could be considered a caregiver. Regarding J.H.'s case, Hernandez testified the Department identified Gonzalez, Grandmother, and Mother as the adults in the household where J.H. lived. Hernandez further testified "[a]ll adults in the home" would have been responsible for providing J.H. medical attention if they saw the condition he was in prior to his death. On cross-examination, Hernandez agreed the biological parent would have the "first and ultimate, highest responsibility" to see to the needs of their child.

4

Sanda Tamayo, a Willacy County Sheriff's Office (WCSO) investigator, testified she arrived at J.H.'s residence at 6:54 a.m. on January 21, 2021, after receiving a call requesting assistance. Tamayo testified she first made contact with Grandmother, who identified the home's residents as herself, Gonzalez, and D.H., J.H.'s younger brother. The trial court admitted into evidence dozens of photographs and a video of the home taken by the WCSO. Tamayo explained she found J.H.'s bed with sheets on and a pillowcase, which the State noted was not how EMS found the bed hours earlier. Tamayo later interviewed Gonzalez at the WCSO. In the interview, Gonzalez stated J.H. was fine the night before he was taken and had eaten pizza and a banana. Gonzalez also stated that J.H. fell a lot in the house and that in the weeks leading up to the incident, J.H. would not do anything for himself. Among J.H.'s injuries was a large blister on his knee which Gonzalez stated he treated with "Toque Morado," an antiseptic medicine. Gonzalez claimed J.H. had a big appetite and would eat a lot. However, Gonzalez then claimed J.H. was getting skinnier so Grandmother made the decision to stop giving certain medications. Gonzalez stated he was in charge of disciplining J.H., which included using a belt. On cross-examination, Tamayo agreed she uncovered no evidence Gonzalez was involved in some kind of agreement with Mother or Grandmother to harm J.H.

D.H., J.H.'s younger brother, testified he was twelve years old at the time of J.H.'s death and lived in the home with his J.H., Gonzalez, Grandmother, and Mother. According to D.H., J.H. died because he was not being fed. D.H. testified Mother took care of him when he was sick. When it came to meals, D.H. explained that Grandmother or Mother typically cooked but Gonzalez cooked outdoors sometimes. D.H. testified Gonzalez would spank J.H. with a belt "a couple of times" when he lied and Grandmother would also spank

him. According to D.H., Gonzalez punished J.H. by withholding food because J.H. "was the oldest and he should know better." The spankings and withholding of food occurred "[m]ultiple times in different months." D.H. recalled that J.H. often snuck into the fridge for food at night when everyone was asleep.

D.H. described J.H. as pale and skinny the day before his death, and that this had been the case for "[a] few weeks." D.H. believed the last time J.H. had eaten was two days prior to his death. D.H. also testified that around the time of his death, J.H. was unable to get himself up to shower, which resulted in Gonzalez spanking him. On cross-examination, D.H. agreed J.H. was a "sickly" child, Mother and Grandmother took him to see doctors, and Grandmother was responsible for J.H.'s medication. D.H. also agreed that since Gonzalez would work during the day, Mother or Grandmother could have fed J.H. D.H. explained J.H. was clumsy and liked to play outside, which sometimes resulted in minor scrapes and cuts.

K.L., J.H.'s younger sister, testified she was nine years old around the time J.H. died. K.L. lived with her father at the time of J.H.'s death but sometimes stayed at Grandmother's house. She recalled Gonzalez, Grandmother, and Mother all resided there. K.L. further testified Grandmother or Mother would feed her. K.L. also recalled that when J.H. got in trouble, Grandmother or Gonzalez hit him with a belt.

Roberto Mauro Rey, M.D., testified he is a pediatrician and was J.H.'s primary doctor. Rey recalled Mother brought J.H. into his office several times. According to Rey's records admitted into evidence, Mother was usually listed as J.H.'s primary caregiver, but Grandmother was also sporadically listed. Rey agreed J.H.'s records from ages six through twelve did not contain anything troubling; however, Rey noted J.H.'s weight

6

fluctuated abnormally between ages eight to thirteen. Rey explained J.H. had been diagnosed with depression and was medicated for ADHD, which could have contributed to the weight fluctuation. Rey agreed records between March 2020 and June 2020 indicated that J.H. lost sixteen pounds, and stated such a change in weight was abnormal and that he would expect a caregiver to report this change. A July 2020 record indicated that J.H. tested positive for COVID-19, but that he did not need to go to an emergency room. A December 2020 record indicated that J.H. subsequently tested positive for COVID-19 again. Rey noted that after J.H.'s positive test in December 2020, he instructed Mother to take J.H. to an emergency room for testing on a possible skin infection; however, this advice was ignored. On cross-examination, Rey agreed no records listed Gonzalez as J.H.'s caregiver. Rey further agreed he did not notice any signs of physical abuse during J.H.'s in-person visits. Rey testified that if J.H. did in fact have a skin infection, it could possibly result in sepsis, which can cause death.

Forensic pathologist Elizabeth Miller, M.D., conducted an autopsy of J.H. and her examination report was entered into evidence. Miller described J.H.'s body as "unconditioned" and "atrophic" for a male his age. Miller opined that given the condition of J.H.'s body at the time of his death, the need for medical attention would have been apparent to a lay person. Miller explained a fluid blister in J.H.'s left leg indicated organ damage, and the behavior associated with organ failure would include unusual lethargy or an inability to stay awake or speak. Miller testified that in February 2020, J.H.'s weight was within the fiftieth to seventy-fifth percentile for his age; however, by June 2020, he dropped to the tenth percentile. Miller testified the cause of J.H.'s death was "staphylococcus aureus sepsis in the setting of failure to thrive, multiple skin lesions, and

7

subacute upper extremity fractures." Miller explained "failure to thrive" is a term implying a failure to meet certain predetermined standards for physical and intellectual growth. Miller further explained staphylococcus aureus was the bacterium that caused J.H.'s sepsis. Miller opined that a failure to treat a possible skin infection, as Rey speculated was the case, could have possibly led to J.H.'s death. On cross-examination, Miller agreed ADHD medications, depression, and COVID-19 are all factors that can impact appetite.

Jacqueline Garcia testified her family had lived next to J.H.'s home for decades. Jacqueline further testified the adults in J.H.'s home included Grandmother, Mother, and Gonzalez. Jacqueline explained she used to see J.H. at least two to three times a week, but after Gonzalez moved in it was rare. Jacqueline described Gonzales as "[r]ude. Angry. Standoffish." Jacqueline stated that during the pandemic, she would take leftover food to Grandmother. Jacqueline recalled noticing a healing bruise around J.H.'s eye in June 2020, but Gonzalez explained it was from the kids playing. About two days before J.H. was taken to the hospital, Jacqueline recalled hearing a voice cry, "Ya, Apá" late at night. Jacqueline explained the phrase means "Stop, Grandfather" or "Stop, Father." Jacqueline was unsure who it was but was very concerned and considered calling the police.

Genette Spear, a forensic nurse at Valley Baptist Medical Center in Harlingen, testified that she examined J.H. at the hospital. The trial court admitted into evidence Spear's examination report along with photos taken. Spear noted the photographs show abrasions (scraping off the top skin layer) on J.H.'s right orbital bone, right ear, lower right jaw line, neck, collarbone, forearms, hips, knees, ankles, feet, ribs, chest, forehead, buttocks, elbows, back, scalp, and thighs. J.H. also had an avulsion (a piece of flesh

8

missing) on his right knee. There were also bruises in different stages of healing throughout J.H.'s body. Spear testified J.H.'s overall appearance indicated he was malnourished, which should have alerted an average person he needed medical attention. Spear concluded that the failure of J.H.'s caregivers to provide medical care and attention in this state was an act clearly dangerous to human life. On cross-examination, Spear clarified that the abrasions she observed were not necessarily the result of an assault. On re-direct, Spear observed that photographs of D.H.'s body taken the same day J.H. was admitted did not indicate any trauma, and that D.H. seemed healthy. Spear noted that the discrepancy between D.H.'s and J.H.'s bodies would be a red flag that mandated reporting for potential child abuse.

Elisa Trejo testified she was J.H.'s special education teacher from second through fifth grade. Trejo testified J.H.'s primary contacts were Grandmother and Mother. Trejo further testified J.H. bore visible bruises on his arms and legs during her final two years of teaching him. Trejo testified she made a report to CPS concerning J.H. around his fifth-grade year because he was always hungry and visibly losing weight; one time when asked why he was so hungry, he told her he was not eating at home. Trejo described him as "thinning out" with "sunken eyes" at that time and that "[h]e always looked as if he just wasn't taken care of." In comparison to D.H. and K.L., J.H. appeared in far worse condition. Trejo testified that she had never seen Gonzalez before, but he was listed as a household member on certain forms. On cross-examination, she agreed she told investigators it was Grandmother who "was in charge."

Fred Harrison, J.H.'s paternal grandfather, testified he went to visit his grandsons in 2017, but when he arrived, Grandmother would not allow him to see them and Gonzalez

9

began "yelling and screaming" at him. Grandmother eventually relented and said, "[Gonzalez] is going to let you see them." After about five minutes of visiting with his grandsons, Harrison testified Gonzalez began yelling that it had been long enough and commanded the boys, "Come inside right now." On cross-examination, Harrison conceded that in a letter written to the media after J.H.'s death, Harrison only blamed Mother and Grandmother for preventing him from seeing his grandchildren.

Oscar Rivera testified he served as the WCSO lead investigator for J.H.'s death. Upon reviewing photos of J.H.'s body, Rivera explained that the WCSO began investigating potential child abuse or neglect. From Rivera's review of Reyna's class recording, he explained adults in the background would have noticed J.H.'s disoriented condition. Rivera also noted he heard an adult male voice in the background, and that Gonzalez was the only confirmed adult male in the house. Rivera believed there was a cover up due to discrepancies such as whether Mother's boyfriend lived in the house and J.H.'s bed being made after his body was taken by EMS. Based on the investigation, Rivera testified Gonzalez was one of J.H.'s caretakers that had assumed care, custody, and control over him. Rivera explained Gonzalez would have been aware of J.H.'s condition because he bathed J.H. and would see the extent of his injuries and overall deterioration. Rivera concluded Gonzalez was a responsible party in J.H.'s death because Gonzalez "participated in not providing [J.H.] with medical care" and "not providing [J.H.] with nutrition." On cross-examination, Rivera conceded Gonzalez does not appear to have been at J.H.'s December 2020 doctor's visit where Mother was instructed to get him treated for a possible infection and there was no evidence Gonzalez was directly aware of the infection. Rivera also agreed Mother never directly incriminated

10

Gonzalez.

## II.    SUFFICIENCY

By his first issue, Gonzalez contends the evidence was legally insufficient to support his conviction as a party to the charged offenses. Specifically, Gonzalez argues there is no evidence he formed an agreement with Mother and Grandmother to withhold medical care or nutrition.

In his initial brief, Gonzalez focuses exclusively on the sufficiency of evidence as to the State's party-liability theory; however, the State also presented evidence to support a principal-liability theory, which his initial brief fails to address.[2] The jury was charged on both theories and rendered a general guilty verdict. *See* TEX. PENAL CODE § 7.01(a) ("A person is criminally responsible as a party to an offense *if the offense is committed by his own conduct*, by the conduct of another for which he is criminally responsible, or by both." (emphasis added)). "Because appellant has chosen not to challenge the sufficiency of the evidence on the principal theory, he has waived any argument he might have had on appeal." *Moreno Denoso v. State*, 156 S.W.3d 166, 172 (Tex. App.—Corpus Christi–Edinburg 2005, pet. ref'd); *see* TEX. R. APP. P. 38.1(i), 44.2; *see also Speers v. State*, No. 05-15-00179-CR, 2016 WL 929223, at *15 (Tex. App.—Dallas Mar. 10, 2016, no pet.) (mem. op., not designated for publication) (explaining a defendant's failure to contest

---

[2] In his reply brief, Gonzalez argues that "the evidence does not 'clearly support' a conviction for [Gonzalez] causing the harm as a principal actor." He contends that the evidence established that Mother was the primary caregiver and that no evidence showed Gonzalez possessed authority to direct J.H.'s medical care or that he prevented J.H. from receiving medical care. Even if the evidence did not "clearly support" Gonzalez's guilt as a principal, that does not mean the evidence was *insufficient* to support that theory. *See, e.g.*, *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). In any event, we need not consider arguments raised for the first time in a reply brief. *See Deutsch v. State*, 566 S.W.3d 332, 341 n.9 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *see also Chambers v. State*, 580 S.W.3d 149, 161 (Tex. Crim. App. 2019) (noting an appellant may not "raise[] a completely different sufficiency challenge for the first time in a reply brief").

sufficiency of the evidence as to theories he acted as a principal or a party promoting his accomplice "presents no error" (citing *Kitchens v. State*, 823 S.W.2d 256, 259 (Tex. Crim. App. 1981))). Thus, we overrule Gonzalez's first issue. *See Moreno Denoso*, 156 S.W.3d at 172 (first citing *Rabbani v. State*, 847 S.W.2d 555, 558 (Tex. Crim. App. 1992); and then citing *Edwards v. State*, 106 S.W.3d 833, 839 (Tex. App.—Dallas 2003, pet. ref'd)); *see also Speers*, 2016 WL 929223, at *15.

### III. CONFRONTATION CLAUSE

In his second issue, Gonzalez argues the trial court erred by admitting Mother's and Grandmother's out-of-court statements in violation of Gonzalez's rights under the Sixth Amendment's Confrontation Clause.[3] *See* U.S. CONST. amend. VI; *see also* TEX. CONST. art. I, § 10.[4] In response, the State argues the admission of Mother and Grandmother's testimony did not violate the Confrontation Clause because the statements were not offered to prove the truth of the matters asserted therein. Alternatively, the State argues any error in the admission of the statements was harmless.

### A. Standard of Review and Applicable Law

The Sixth Amendment's Confrontation Clause provides an accused with the right "to be confronted with the witnesses against him." U.S. CONST. amend. VI; *see also* TEX. CONST. art. I, § 10 ("In all criminal prosecutions the accused . . . shall be confronted by the witnesses against him . . . ."). In this regard, when a witness makes an out-of-court

---

[3] Mother and Grandmother were tried separately.

[4] Gonzalez contends that the Texas Constitution's Confrontation Clause "offers stronger safeguards" compared to its federal counterpart. However, Gonzalez cites no authority to support his position and following other Texas courts we likewise decline to interpret Texas's Confrontation Clause to impose protections greater than those afforded under federal law. *Garrett v. State*, 518 S.W.3d 546, 549 n.2 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd); *Rivera v. State*, 381 S.W.3d 710, 713 (Tex. App.—Beaumont 2012, pet. ref'd); *King v. State*, 189 S.W.3d 347, 361 (Tex. App.—Fort Worth 2006, no pet.).

"testimonial" statement against the accused, such a statement is admissible only when (1) the declarant is unavailable, and (2) the accused has had a prior opportunity to cross examine the declarant. *See Crawford v. Washington*, 541 U.S. 36, 68 (2004); *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008). "Generally speaking, a hearsay statement is 'testimonial' when the surrounding circumstances objectively indicate that the primary purpose of the interview or interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *De La Paz*, 273 S.W.3d at 680 (citing *Davis v. Washington*, 547 U.S. 813, 822–23 (2006). "Statements taken by police officers in the course of interrogations are testimonial." *Hale v. State*, 139 S.W.3d 418, 421 (Tex. App.—Fort Worth 2004, no pet.) (citing *Crawford*, 541 U.S. at 51).

A trial court's determination of a Confrontation Clause objection is reviewed de novo. *Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006). If the reviewing court finds error, it must undertake a constitutional harm analysis: "[T]he court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a); *see Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007). For Confrontation Clause error, the Texas Court of Criminal Appeals has instructed that this analysis requires courts to consider: (1) how important the out-of-court statements were to the State's case; (2) whether the out-of-court statements were cumulative of other evidence; (3) the presence or absence of evidence corroborating or contradicting the out-of-court statements on material points; and (4) the overall strength of the prosecution's case. *Scott*, 227 S.W.3d at 690. The court further explained:

> With these considerations in mind, the reviewing court must ask itself whether there is a reasonable possibility that the *Crawford* error moved the

jury from a state of non-persuasion to one of persuasion on a particular issue. Ultimately, after considering these various factors, the reviewing court must be able to declare itself satisfied, to a level of confidence beyond a reasonable doubt, "that the error did not contribute to the conviction" before it can affirm it.

*Id.* at 690–91.

## B.    Mother and Grandmother's Testimony

During Rivera's direct examination, the State offered into evidence a video recording of Mother's statement to Rivera taken on January 21. Over a Confrontation Clause objection from Gonzalez, the trial court admitted the recording into evidence, and it was played in open court. In the video, Mother stated J.H. was diagnosed with COVID-19 a month prior. Mother further stated he was kept in quarantine and had to wear diapers because he was not getting up to use the toilet. She claimed Grandmother decided to stop giving J.H. certain medications because he looked thinner than normal. Mother also claimed Gonzalez would not let J.H. outside because J.H. was constantly falling and injuring himself. Mother stated J.H. was complaining about pain in his left arm about four days prior. Mother claimed "they" noticed J.H. disoriented and slurring his words during class about two days before the incident. Mother also claimed J.H. was laughing with the family and eating normally the night before the incident. Mother then stated J.H. responded normally when Gonzalez asked if he was okay.

Rivera then testified as to Grandmother's statement to investigators.[5] Over another Confrontation Clause objection from Gonzalez, the trial court allowed the testimony. Grandmother told Rivera that she found J.H. struggling to breathe around 2:00 a.m. on

---

[5] The trial court did not allow the video recording of Grandmother's statement into evidence because it was mostly in Spanish and was offered without an official translation.

14

January 21. Grandmother stated J.H. ate normally the night before he was taken to the hospital. Rivera testified this was inconsistent with the autopsy. As far as his body, Grandmother stated she looked after J.H.'s wounds and that he often exacerbated injuries by scratching them. Grandmother also stated she, Mother, and Gonzalez cared for J.H. According to Grandmother, Gonzalez was the disciplinarian for J.H. Grandmother also explained that in the month prior, J.H. had been losing weight but he was still eating fine. Grandmother mentioned J.H.'s teacher had called Mother two days before to inform her that he appeared disoriented in class.

Later, Mother and Grandmother were called to the stand outside the presence of the jury, but both invoked their Fifth Amendment right against self-incrimination and refused to answer any questions.

## C. Harmless Error Analysis

We assume without deciding that the trial court erred in admitting the recording of Mother's statement to investigators and allowing Rivera to testify as to Grandmother's statement.[6] *See generally Avant v. State*, 499 S.W.3d 123, 126 (Tex. App.—San Antonio 2016, no pet.) ("Even when hearsay offered against a defendant is admissible under evidentiary rules, that evidence may implicate the Confrontation Clause of the Sixth Amendment if the defendant is not afforded the opportunity to confront the out-of-court declarant." (quoting *Gonzalez v. State*, 195 S.W.3d 114, 116 (Tex. Crim. App. 2006))). If

---

[6] The State argues on appeal that statements at issue were not offered for the truth of the matter asserted, and that thus the Confrontation Clause does not bar them. *See Langham v. State*, 305 S.W.3d 568, 576–77 (Tex. Crim. App. 2010) ("When the relevance of an out-of-court statement derives solely from the fact that it was made, and not from the content of the assertion it contains, there is no constitutional imperative that the accused be permitted to confront the declarant."). *But see Kelley v. State*, No. 02-23-00296-CR, 2024 WL 3196072, at *3 (Tex. App.—Fort Worth June 27, 2024, no pet.) (mem. op., not designated for publication). We need not address this issue in light of our conclusion that any Confrontation Clause error was harmless. *See* TEX. R. APP. P. 47.1.

the record shows, beyond a reasonable doubt, that the admitted statements did not contribute to the guilty verdict, then any constitutional error was harmless. *See* TEX. R. APP. P. 44.2(a). We thus examine the record in light of the *Scott* factors to make this determination. *See* 227 S.W.3d at 690.

### 1. Importance of the Out-of-Court Statements to the State's Case

Gonzalez argues Mother's and Grandmother's statements "were critical to establishing [Gonzalez's] role in [J.H.'s] care and his awareness of [J.H.'s] condition." Gonzalez points to Rivera's comment that Mother's statement showed Gonzalez "had personally observed [J.H.] in a disoriented state." Gonzalez further argues Grandmother's statement to Rivera "established that [Gonzalez] was responsible for disciplining [J.H.], creating the inference that he had a significant caretaking role." Gonzalez also complains Grandmother mentioned J.H. was "fine" the night before his hospitalization, from which Rivera inferred "that all the adults, including [Gonzalez] were not only aware of [J.H.'s] deteriorating condition, but also actively attempting to 'lie' about it." Gonzalez concludes that "[w]ithout these statements, the evidence linking [Gonzalez] to criminal responsibility for [J.H.'s] medical neglect was substantially weaker, as their statements [were] used to establish the elements of [Gonzalez's] care, custody, or control over [J.H.]."

We disagree with Gonzalez. The out-of-court statements were presented during the last witness's testimony after over seventeen witnesses testified. The jury had already heard overwhelming evidence indicating Gonzalez was aware of J.H.'s deteriorating condition. Multiple witnesses testified J.H.'s condition at the time of his death should have raised immediate concern to an average person, and the jury viewed photographs of J.H.'s body. Gonzalez admitted to Tamayo that in the weeks leading up to his death, J.H.

16

would not do anything for himself. Garcia testified she did not believe J.H. was thirteen because he was "very malnourished" and "his ribs and his collarbones were all protruding out." D.H. testified J.H. had appeared skinny and pale for a few weeks prior to his death. Miller testified J.H.'s body was "conditioned" and "atrophic" for a boy his age and that the need for medical attention would have been apparent to a lay person. While Gonzalez claimed J.H. ate a pizza and a banana the night before he was hospitalized, Miller's autopsy report revealed that J.H.'s stomach only contained mucus. Spear testified J.H.'s overall appearance indicated he was malnourished, which should have alerted an average person he needed medical attention. Rivera testified that Gonzalez would have seen the extent of J.H.'s deterioration because Gonzalez bathed and cleaned J.H. when he soiled himself. According to Hernandez, "[a]ll adults in the home" would have been responsible for providing J.H. medical attention if they saw this condition he was in prior to his death. The recording of Reyna's Zoom class with J.H., taken the day before he was hospitalized, showed J.H. in an unresponsive state. An adult male voice is heard in the background saying, "Now he's pretending he doesn't know anything." According to Rivera, the investigation showed that Gonzalez was the only adult male living in the house. This evidence established that Gonzalez personally observed J.H. in a disoriented state just hours before his hospitalization. *See Proo v. State*, 587 S.W.3d 789, 812 (Tex. App.—San Antonio 2019, pet. ref'd) (holding that the jury could have reasonably inferred from evidence presented that the defendant knowingly caused the victim serious bodily injury by failing to provide adequate nutrition or medical care); *Dorch v. State*, 596 S.W.3d 871, 886 (Tex. App.—San Antonio 2019, pet. ref'd) (holding that photographs and expert testimony "support[ed] a reasonable inference that [defendant], as caretaker for the

17

children, was aware of [victims'] malnourished conditions and that his failure to provide them with sufficient food or medical care was reasonably certain to cause them serious bodily injury").

To the extent Gonzalez argues Grandmother's out-of-court statements established his role in care, custody, or control of J.H., there was already overwhelming evidence presented in that regard. Multiple witnesses readily identified Gonzalez as one of the adults living in the home. Gonzalez told Tamayo he treated the larger blister on J.H.'s knee with "Toque Morado," an antiseptic medicine. D.H. testified Gonzalez would sometimes cook outdoors for the family. Harrison testified that he was only allowed to see his grandchildren after Gonzalez gave permission, and Gonzalez chose to end the visit and commanded the boys inside. Gonzalez told investigators he oversaw the discipline of J.H., which D.H. and K.L. testified to as well. D.H. testified Gonzalez would punish J.H. by spanking him and withholding food. And, again, Rivera testified Gonzalez would shower and clean J.H. when J.H. soiled himself. This evidence established that Gonzalez had accepted responsibility for the protection, food, shelter, and medical care for J.H. *See* TEX. PENAL CODE § 22.04(b)(2), (d); *Skorich v. State*, No. 07-25-00002-CR, No. 07-25-00001-CR, 2026 WL 872251, at *8 (Tex. App.—Amarillo Mar. 30, 2026, no pet.) (holding evidence that defendant lived in family unit with victim, referred to victim as "son," provided food, and ongoingly disciplined the victim was sufficient to support care, custody, or control).

Because previously-admitted evidence already establishes the facts set forth in the out-of-court statements, this factor weighs against a finding of harm. *See, e.g.*, *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) ("[O]verruling an objection to

18

evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling.").

## 2. Whether the Out-of-Court Statements Were Cumulative of Other Evidence

Gonzalez argues no other sources of evidence provided similar information about Gonzalez's awareness of J.H.'s condition or his role in medical decision-making. The State had the burden of proving beyond a reasonable doubt that Gonzalez assumed care, custody, or control of J.H., which encompasses more than just medical decisions. *See Skorich*, 2026 WL 872251, at *7–8. As described above, aside from the out-of-court statements, there was already overwhelming evidence indicating that Gonzalez assumed care, custody or control of J.H., was aware of J.H.'s condition, and still failed to take any action. We conclude this factor weighs against a finding of harm. *See id.*

## 3. Evidence Corroborating or Contradicting the Out-of-Court Statements

Gonzalez argues significant evidence contradicted the implications drawn from Mother's and Grandmother's statements, and points to testimony from several witnesses. While Rey testified J.H.'s mother was instructed to take J.H. to the emergency room and Rivera testified there was no evidence Gonzalez prevented anyone from taking J.H. to the hospital, this evidence did not contradict the out-of-court statements. As discussed above, there was ample evidence to corroborate the implication, generated by the out-of-court statements, that Gonzalez assumed care, custody, or control of J.H. and was aware that prohibiting J.H. from eating and not seeking medical assistance for J.H. was reasonably certain to cause serious bodily injury. *See Dorch*, 596 S.W.3d at 877–886. Gonzalez next points to Tamayo's testimony that there was no explicit evidence of an

agreement between Gonzalez, Mother, and Grandmother to harm J.H. As mentioned previously, the State also presented evidence and charged the jury on a principal-liability theory, which Gonzalez again fails to address. We conclude this factor weighs against a finding of harm. *See Leday*, 983 S.W.2d at 718.

### 4. Overall Strength of the Prosecution's Case

Gonzalez argues that without the out-of-court statements, the State's case was weaker on its theory of Gonzalez's responsibility as a party. As mentioned previously, the State also presented evidence and charged the jury on a principal-liability theory, which Gonzalez fails to address. Gonzalez then contends that there was no direct evidence to establish he had awareness of J.H.'s medical needs. We have addressed this point previously and reached the opposite conclusion. *See Proo*, 587 S.W.3d at 812; *Dorch*, 596 S.W.3d at 886; *see also Hooper*, 214 at 14–15 ("Circumstantial evidence alone can be sufficient to establish guilt" and is just "as probative as direct evidence."). We conclude this factor weighs against a finding of harm. *See Leday*, 983 S.W.2d at 718.

As we have found all four factors in our analysis weigh against a finding of harm, we conclude there is little to no "likelihood that the constitutional error was actually a contributing factor in the jury's deliberations in arriving" at their verdict. *Scott*, 227 S.W.3d at 690. As a result, we are satisfied beyond a reasonable doubt that the trial court's error in admitting Mother's and Grandmother's out-of-court statements did not contribute to Gonzalez's conviction. *See id.* at 690–91; *Clay v. State*, 240 S.W.3d 895, 905–06 ("The erroneously admitted evidence established little, if anything, negative about appellant that was not also well established by the properly admitted evidence."); *see also* TEX. R. APP. P. 44.2(a). We therefore overrule Gonzalez's second issue.

### IV. CONCLUSION

We affirm the trial court's judgment.

L. ARON PEÑA JR.
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
25th day of June, 2026.